Hooks v. Atoki My name is Daniel Brookins and I represent Mr. Hooks in today's appeal. Below Mr. Hooks was not represented by counsel and his claims were prematurely dismissed by the District Court. In this appeal, we ask this Court to correct those rulings and allow Mr. Hooks to return below and continue pursuing his meritorious claims. And specifically in today's argument, I'd like to address three points. First, the dismissal of the excessive force claims under Heck v. Humphrey. Second, the District Court's decision to award summary judgment to defendant Atoki. And third, whether Kingsley v. Hendrickson changes the standard for pretrial detainee claims of deliberate indifference for failure to protect. And I'd like to begin with the first point, the Heck v. Humphrey issue. This was Roman numeral 1 in our briefing. Here, the District Court held that these claims were Heck-barred because Mr. Hooks alleged that he did not attack the officers and this would not sustain the elements of assault under Oklahoma law. This ruling was incorrect for two reasons. First, it improperly expanded Heck and second, it failed to apply the liberal pleading standards that Mr. Hooks was owed as a pro se plaintiff. I don't think you can spend much time on the first issue if there was excessive force that was stated that came after his being apprehended and arrested and clearly Heck would not apply. The question is whether a fair reading of the complaint would show that this claim was being made. That would have been the error by the District Court. Can you focus on that point? Sure, Your Honor. So, especially under the liberal pleading standards, a reasonable reading of the complaint is that Mr. Hooks alleged that the excessive force came after he was subdued. Could you read those pleading statements for us, please? Do you have them there? Sure. I do. Let me just grab it real quick. I don't want you to take your time. If you don't have it right there, just move on. We'll look for it. Proceed. I do. I do have it. Here it is. It says, Chris Harding approached Ashina Yarborough's car with his gun drawn, ordering me to place my hands on the dash, which I did. Chris Harding opened my door and began removing me from the car. Once out of the car, Chris Harding began trying to take me to the police car without telling me why he was containing me. Chris Harding didn't try to place handcuffs on me, so I pulled away from him like, what are you doing? Chris Harding and James Irby began wrestling with me. Chris Harding then pushed me between both cars and yelled for James Irby to taser me, causing me to drop to the ground and hit my head on the ground repeatedly and left me laying on my stomach, not moving at all. Chris Harding ordered James Irby to taser me again. After the second round of tasering, Chris Harding dropped to his knees and then placed me in a chokehold until Ashina Yarborough, Ashina started screaming. Well, that, on that, I remember that language in the pleadings, but that doesn't specifically say what he alleged as to when the arrest occurred. Now, I guess he says I allege facts and it's up to the court to decide when my freedom to leave was taken away from me. Is that your point? So we can just, we can then decide, okay, was he free to leave at the time he was tased the first time or the second or when he was taken down or when he was met at the car or when? So your point is simply, that's up to us to decide when he was arrested. I, if I understand your honors question correctly, I think the answer is yes. And I think the answer is yes, because Heck versus Humphrey requires a tightness of events for there to be the logical necessity, uh, leading to a contradiction between, uh, between the section 1983 claim and the conviction, which means that the district court's ruling here was really wrong for two reasons. The facts leading up to the excessive force don't really matter for purposes of Heck. And the reason there is because Mr. Hooks could be wrong about those facts and still win. So you wouldn't have the necessary contradiction. Multiple circuits have recognized this and this circuit in fact, recognizes in Martinez. In Martinez, the plaintiff was convicted for resisting arrest. He then brought a section 1983 claim where he alleged excessive force and in his complaint, he specifically alleged that he did not resist arrest that directly contradicted his conviction, but that this court held that the district court improperly applied Heck. And the reason is because he could have been wrong about that allegation and still won. In other words, even if he did resist arrest, even if he assaulted the officers in the process, the allegation was that he rolled up the car, rolled up his car window on the officer, that So when we apply that here, we have a situation where even if Mr. Hooks is wrong about those allegations, so even if we take the district court's analysis as true, even if Mr. Hooks alleged that he didn't attack the officers, he could be wrong about that and still win. And under Martinez, that means that Heck doesn't apply. Why don't you go to your other issues, Mr. Brookings? Okay. Okay. I think that was the second point to go to them. Sorry. I don't. I understood that Judge Harts was just inviting you to turn to those next two issues. Yes, Your Honor. Sorry. I was just pulling up my notes. Well, I'd like to check. Can we skip quickly over to and get to your others? Because we're bound by strain, right? So strain resolved a very particular issue. Strain resolved deliberate indifference to medical needs. And this court, like most circuits in the country, have recognized different types of deliberate indifference claims. There's deliberate indifference to medical needs, deliberate indifference for failure to protect, failure to intervene. And just as Regalado refused to extend Kingsley to a context Kingsley didn't consider, this court should refuse to extend Regalado to a context it didn't consider. Regalado did not. Let me interrupt. In strain, we cite and rely on Farmer versus Brennan, a Supreme Court case in which it was deliberate indifference of prison officials to an incident where the plaintiff was beaten and raped by another inmate. So it looks to me like our analysis in strain would apply more broadly than you're suggesting. Your Honor, I would not read strain quite so broadly. I think strain was careful to limit both its holding and its reasoning to the medical deliberate indifference context. And I have some specific language I can point to. The court said, quote, we hold that deliberate indifference to a pretrial detainee's serious medical needs includes both an objective and a subjective component, end quote. And its reasoning was similarly narrow. It said, quote, Kingsley turned on considerations unique to excessive force claims, whether the use of force amounted to punishment. The deliberate indifference cause of action does not relate to punishment but rather safeguards a pretrial detainee's access to adequate medical care. In other words, it's difficult to infer punitive intent in the medical context. But that's not the case in failure to protect claims. So we concede that regular misconduct. The main thing that was going on was that deliberate indifference doesn't involve the misconduct, the affirmative misconduct of the officers. It involves the officers' deliberate decision not to stop misconduct by others. And I think that the failure to call in adequate medical assistance, it's hard for me to see any difference between that and the failure to protect an inmate from violence by another prisoner. The violation, the violence is not by the officer. The liability is because the officer fails to protect some wrongdoing by someone else. And isn't that the main commonality between HECT and our case? No, Your Honor. And I think this case illustrates why. Defendant Atoke allegedly was in the pod booth while Mr. Hooks had his face stomped on for a full minute. Those facts alone show that this is different from the medical context in Regalado where he was just taking issue with the course of treatment. Here we're dealing with something where it's conceivable that a jail guard could punish an inmate through excessive force directly or indirectly, as the case here possibly, by not doing anything when an inmate is getting attacked. And I think the en banc Ninth Circuit addressed this in Castro, and I'd like to just read a quick quote. They said, just as they have a duty to use only appropriate force themselves. And they're getting at, here, the excessive force and the failure to protect context are similar in that force is being dispensed whether or not it's the officer doing it or whether or not it's the officer allowing someone else to do it. And that's very different than the medical context that the court addressed in Strain. And if there are no other questions on that point, I'd like to briefly turn, Your Honor. That's okay. You can use your time on your next issue. I'd like to briefly address the district court's decision to grant summary judgment to defendant Atoke. The facts underlying this issue are truly gruesome. Mr. Hooks was attacked for a full minute by a rival gang. The jail personnel who reported noted in their reports just how bad it was. Deputy Lira said, I observed a large pool of blood underneath Mr. Hooks' head. Inmate Hooks was unable to breathe due to the amount of blood coming from his mouth and nose. Captain Harden said his face was covered in blood, a pool of blood on the floor just under his head. He was making noise as if he were struggling to breathe and several officers were holding him to assist him in maintaining an open airway. And despite the fact that Mr. Hooks was beaten within an inch of his life, the district court still shut the courthouse doors on him. And to do so, it improperly drew two inferences in the movement's favor. And as this panel well knows, on summary judgment, all reasonable inferences should have been drawn in Mr. Hooks' favor. Specifically, the district court held that the video showed that, quote, Mr. Atoke never approached the pod office window closely enough to see the attack. But the video doesn't show the whole pod. The video only shows a third to a half of the pod. And the testimony was an equipose. The testimony of Mr. Hooks was that he saw Mr. Atoke in the pod and the testimony of Mr. Atoke was that he wasn't in the pod. So that's a classic. If we agree with you and we say that interpreting the facts in the light most favorable to your client, don't you still have a problem with causation and with whether a reasonable juror could find that 28 seconds is not a reasonable response time? I mean, the entire attack here took 28 seconds. No, Your Honor. I also would just slightly disagree with the characterization of the events. The attack started at 9.42.03 and ended at 9.42.45, which is about 43 seconds. And although those attacks were split up, that does have implications for the response time. Specifically, we know that the call for help came in at 9.42.36 and that the response came in at 9.42.55, which means that the response time is 19 seconds. And that also means that if the call for help had been placed at any time before 9.42.23, the second attack, which was arguably even more brutal than the first one, could have been prevented and Mr. Hook's injuries could have been mitigated. So where is there an allegation that a talkie knew about the danger, saw the risk, and made a decision, a subjective decision, I recognize this danger and I choose not to act? Well, Your Honor, I think under the liberal pleading standard that Mr. Hooks was owed, those allegations are there and I think the district court in its opinion even recognized that. Construing Mr. Hooks' allegations reasonably, the district court said that those theories were there and I don't even think that the appellees have challenged that in this case. If there are no further questions. I have a question. Yes. You said that there's evidence that Mr. Atoke was in the pod. What about whether he could have seen what happened? Because there was someone in the pod who came over within camera range and saw what happened. Is there any evidence that Mr. Atoke could have seen what happened if he was not, but not within camera range? Because there's a difference between just hearing some commotion and seeing what's going on. Well, I think this is why it's important to note that the video doesn't show the whole pod. We don't know what the other windows show. Isn't it pretty indicative if someone in the pod came to the part of the pod within camera range to see what was going on? Doesn't that suggest that you had to be in that position to see what was going on? I don't believe so, Your Honor. I think that the video doesn't show the whole pod. And if I may just, I see that my time has run out. If I may just answer your question. Yes, you may. The video doesn't show the whole pod. And I think if we were to make the conclusion that you're implying here, which is that Atoke could have only seen it if he walked to that spot, is to draw inferences in his favor. And I think the inference should be drawn in Mr. Hooks' favor, which is that you could see that spot from other places in the pod booth. We don't even have pictures showing what the whole pod booth looks like. And for that reason, we'd ask that you reverse the summary judgment decision as well as the other issues we've challenged in our brief. Thank you, Your Honor. Mr. Smith, are you leading off? Yes, Your Honor. Good morning, Your Honors. May it please the Court. My name is Carson Smith. I'm here representing Applebee's, Harding, and Irby. As to the heck issue, this case spotlights the project of setting or buttressing the proper margins of liberal construction of a complaint subject to the Twombly analysis in a heck context. I would submit plaintiff's position, and that advocated for today, strays well beyond the margins, the proper margins of liberal construction, and it veers much more markedly into prohibited territory. I think that fact, that position of moving beyond liberal construction, is pointed out by the tension that we find with Twombly. I'll read a few common articulations of the Twombly standard, and as against plaintiff's position. The reviewing court must accept the plaintiff's allegations as true and construe them in any reasonable inferences therefrom and the like most favorable to the plaintiff. Here, plaintiff's position implicitly asks the court to, well, let's take certain allegations as mistaken and kind of excise those from the analysis and take other allegations as true. It forces Twombly to be kind of a mixed bag and inverts the Twombly analysis. Be specific about that because Mr. Brookins read from the complaint it sounded pretty reasonable to assume that he was subdued when some of the later force was used against him. So be specific. I will, Your Honor. Thank you for that. So reading another articulation of Twombly I think would dovetail into that. I don't want you to read articulations of Twombly. I want you to be specific with respect to the allegations in the complaint. You just said that the allegation that force was used after he was subdued, that theory is contradicted by allegations in the complaint. I did not hear that from Mr. Brookings' reading of the complaint. So point that out. What I'm saying is it appeared to me, and I may have missed stuff, that the allegations were quite consistent with his being subdued. He's already been tased. He's down. He's hit his head. And left me lying on my stomach, not moving at all, and then second tasing. Right. Your Honors, in that respect, if we hone in on just those two sentences and we utterly delete, we utterly eliminate the prior sentences, then it becomes a closer question. My point would be under Havens. Be specific. What prior sentences are inconsistent with his having been subdued when the second tase was shot? Well, Your Honor, the sentences that precede that point, which would be four to six sentences. In fact, I counted nine sentences that form the narrative of the version of events set forth by plaintiff. So plaintiff wants the court to delete those first six sentences, all of them, and focus on the three sentences that we're looking at now. To the extent his claim is based on the first six sentences, it probably is inconsistent with Heck. Correct. Your Honor, my. Whether you can have six sentences that can't state a claim under Heck and then have three sentences or one sentence that is consistent with the claim under Heck. Your Honor, in looking at those few sentences, I think there might be an argument for that. My point is panning back. I think Twombly prohibits the kind of. Twombly is about framing the complaint, taking the allegations as true, and making sure there's enough factual meat to state a claim for relief that is plausible on its face. The kind of approach advocated for by plaintiff is, well, let's unframe the complaint and let's reach into the complaint and blot out certain sentences and we'll elevate other sentences and we'll minimize facts and then we'll elevate facts. And I think that is contrary to both Twombly and to Havens in the way that a reasonable construction of the complaint means all the allegations of the complaint. It doesn't allow unframing the complaint and excising meat. Isn't the law clear that you can have some part of the claim barred by Heck and another part not barred by Heck? I think that's all that's going on. You seem to think it's an all or none proposition. If it is an all or none proposition, you win. But it's not an all or none proposition. No, I would agree that it's not an all or none proposition, Your Honor. However, to the extent that plaintiff relies on Martinez, I think it's indicative that Martinez was a pre-Twombly case. And I think it's indicative that both Havens and DeLon say there are allegations that plaintiff sets out that we can accept wholly as true without reaching into the complaint and reconstructing the complaint's allegations. Let's go to other issues. Is that all right, Judge McHugh? That's fine. I will pass to Applee, Mr. Young. Good morning, Your Honors, and may it please the court. The sole issue on appeal with regard to my clients, I represent Armour and Dr. Childs. The sole issue is whether the court erred in applying the two-pronged deliberate indifference standard. And another way to say that is the sole issue on appeal regarding Armour and Dr. Childs is whether the Tenth Circuit should adopt the Kingsley standard. As Judge McHugh has already acknowledged just a moment ago, the court is going to be bound by strain on this issue. It's already answered it decisively, which was decided since this case was briefed. For some background, in 2015, in Kingsley v. Hendrickson, the United States Supreme Court heard a claim brought by a pretrial detainee for excessive force brought pursuant to the 14th Amendment. The Kingsley court held that with regard to an excessive force claim, the plaintiff did not have to prove that the officer was subjectively aware that the use of force was unreasonable, and instead an objectively unreasonable standard may be applied to an individual. Since Kingsley, several courts have heard similar arguments, and the Fourth Circuit declined to extend Kingsley to a claim for deliberate indifference to serious medical needs. The Third, Fifth, Eighth, and now the Tenth Circuits have all outright rejected Kingsley's application to a claim for deliberate indifference to serious medical needs. Apparently a non-bonk Ninth Circuit decision has gone the other way. Is that right? Correct. I believe you're referring to Gordon and Orange. Well, it was a case cited by Mr. Brookins. Is there anything contrary you cited? Yes, there is a split. The Second, Seventh, and Ninth have each gone the other way. However, as I said, the Tenth, Eleventh, Fifth, Third, and Eighth have each gone in favor of declining to extend Kingsley. So by my count, that's a five to three split in favor of the Eppleys in this case. Is there anything further? I'm sorry, I was waiting for further questions. Yeah, I can keep going. In the Tenth Circuit, in Strain, the Tenth Circuit relied on the actual language of Kingsley, which limits it to an excessive force claim. And additionally, the Strain Court relied on the very nature of deliberate indifference, as well as the definition of the word deliberate, which includes an inference that there must be some subjective element in the analysis. Additionally, I would point out that in Appellant's brief, he made a claim that even absent Kingsley, he should have an ongoing claim against the other Appellees, whereas he did not include such a caveat regarding deliberate indifference to serious medical needs. And I point that out just to say that now that Kingsley has come along, I'm sorry, now that Strain has been ruled upon, it would appear to me that Appellant has conceded his claim, in this case, at least against the Dr. Childs and Armour, the healthcare providers. If there are no more questions, I can concede the rest of my time to the counsel. Okay, thank you. Any questions for Mr. Hagee? Excuse me. May it please the court. My name is Rod Hagee. I represent the Last Appellee, Sergeant Atoke. It's unjust, frankly, that Sergeant Atoke was ever named, because he's the officer that ran to the rescue. And he was the officer that showed up on the scene of the gang fight and stopped it. He's the officer that immediately showed up and arrested the wrongdoers. And he did it in less than half a minute. The fact of the matter is, is that our pods on each floor of the cell contain a pod monitoring booth, and a non-contact officer is in that pod monitoring booth. The four camera videos that we provided to the district court clearly indicated that the only person in the pod was a Caucasian officer. Sergeant Atoke is African American, so there's no possible way the video gets it wrong as to who is where on the floor. Well, let me interrupt for just a minute. We have testimony from Mr. Hooks that he actually saw Officer Atoke in the pod.  You've got Officer Atoke saying, I wasn't there. You've got Mr. Hooks saying, I saw you there. And you've got a video that doesn't show the entire pod. Wasn't the district court required to view the facts in the light most favorable to Mr. Hooks' testimony and say that Officer Atoke was in the pod? I think the court did exactly that by comparing what Mr. Hooks said to the  The video clearly showed the Caucasian officer who saw the incident and called it in on the radio, which brought Mr. Atoke, I'm sorry, Sergeant Atoke to the scene. And then Mr. Hooks admitted in his own briefing that it took 20 seconds to get through the security doors to the pod. And so that explains exactly why, from the time you see the Caucasian officer in the video, that you also then see Sergeant Atoke appearing on the video. The logbook produced by Mr. Hooks that he obtained in discovery showed that Mr. Atoke was not signed into the pod on that day. The testimony. The question here is we have a statement under oath. And at summary judgment, we've got to accept that unless there's just irrefutable evidence to the contrary. And you've got pretty, pretty strong evidence to the contrary. You've got to establish to us that it's irrefutable or that it's irrelevant in some way. When I say irrelevant in some way, that's why I asked if the evidence. That if Atoke was not in camera range, he could not have seen the events on the floor. Is there any evidence one way or another on that? The there are four in the pod who was not within view of the camera. Could have seen what was going on. On the floor with the prisoners or could only have heard it. There are four cameras. They show specifically who could see what. Four cameras showing the pod. I thought that part of the pod that was not within camera range. One of the cameras does not show the entire pod. One of the cameras shows the other side of the pod. We have four camera views available on this video. And so when you look at all the cameras together, yes. You can see the entire. You can see. I want to make sure I'm using the right terminology. The place where the guard was. Who saw what happened. That's called what the pod monitoring booth. Okay. The booth. So. If you look at all four cameras, you have a complete view of the booth. Yes. Yes. Yes. And the camera that would show you. And those cameras were running the entire time. Yes. So we can see from those cameras, everyone. Who was in the booth. During this entire minute. Is that right? And the only one in there is a. The only one in there. Is totally not dark skin person. Is that right? Right. Boy, that wasn't clear to me. I thought there was a. I thought there was a gap in the cameras. No, sir. And all four. How big is the. I mean, could there be more than one person in that booth? Physically. Yes. There could be more than one person in the booth. Is there any evidence here that that was a possibility?    I mean, is that against the rules? Or is that against the regs or because he wasn't signed into the booth? The you'll take the position that the record is just undisputed. And he wasn't in the booth. He wasn't signed into it. When combined with the cameras. Yes. But you're saying regardless of whether he signed in. The cameras provide irrefutable evidence. But there was only one person in the booth. During this entire period. And that person could not have been a Toki because of skin color. Is that right? And because a Toki appears on the video. Within 30 seconds of B of the other officer appearing in the pod, seeing the incident. Because you can take 20 seconds to get through the pod security doors. So, so if you're leaving the booth. What would you have to do to get from the booth? To the floor. You'd have to go out in the hall. Come in through the security doors, which are very large, heavy steel doors that have to be opened by machine. No human can move them. It takes 20 seconds for them to cycle. It's a, it's a two doors. The outer door opens, you enter the booth. You are acknowledged by the. Observers on the camera system, that door closes. The door to the cell pod opens. It takes 20 seconds before there's a door open to get into the cell area. Yes. From the hall. So booth door is in the hall. There's no entrance. In the. Cell pod area from the pod monitoring booth. It's a non-contact booth. Okay. Thank you. You've already gone over. Because we've asked questions a couple of minutes. Are there any other questions by members of the panel? No. Mr. Brookings. We'll give you a two minutes. Thank you, your honor. I'd like to begin by. Picking up or Mr. Hey, you left off. The cameras. Do not show the entire pod monitoring. And I would encourage the panel to go watch the video feeds and you can see for yourself that you can not see the entire booth. And also Mr. Hagee is, is inserting facts that are not in the record. We don't have record facts about there's no testimony elicited as to how long it would take to get from the booth. To to back into the pod. So all of that is irrelevant. It's about how long it takes for the doors to cycle. I don't believe so. I don't believe so. Your honor. We also addressed this address this in our reply brief. They're trying to turn a statement that Mr. Hooks made in his brief into an admission, which is inappropriate for a number of reasons. It's, it's also just irrelevant. And even if, even if all of this is true, even if it does take 20 seconds to get from the booth into the pod, that that doesn't mean anything. If we backtrack from nine 50, nine, 42, 55, 20 seconds. That's nine 40 to 35. That means that it took, he could have been in the booth up until that point, which means he would have seen the entire first assault. So all of these facts just mean nothing. I'm not sure why we're spending time talking about them. We're talking about deliberate indifference. You don't expect people to act continuously. They need to figure out what's going on, but okay. Go ahead. I right. I understand that the, that the subjective component matters, but it matters based on the record before the district court. And these facts weren't in the record. And even if they do, they only established that a Toki wouldn't have been in the pod booth after nine 42, 35, which would have been for the whole first assault. And I want to address one other point quickly. The, the argument by a Pele is the regarding Twombly. I don't believe that was in their brief and to the extent it wasn't, it would be waived. Thank you. Counsel cases.